1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
2                 WESTERN DIVISION

3            CASE NO.:  1:06CV544
              (JUDGE BARRETT)
4

5  UNIFUND CORPORATION, et al.,

6       Plaintiffs,     **ORIGINAL**

7  vs.

8  UNIFUND C.C.R. PARTNERS, INC.,

9       Defendant.
  ------------------------------------------/
10

11  **PROCEEDINGS:**     Telephone Deposition of
                 **PETER SALOMON**
12

13  **DATE:**           March 16, 2007

14

15  **TIME:**           1:09 p.m. to 2:22 p.m.

16  **LOCATION:**      7730 Little Road
                 New Port Richey, Florida
17

18  **REPORTED BY:**    LISA ANN BROWN
                 Stenographic Court Reporter
19                 Notary Public, State of
                 Florida at Large
20

21

22

23           ANDERSON COURT REPORTING
             14150 Third Street
              P.O. Box 2426
24         Dade City, FL 33526-2426

25  (352) 567-5484          1-800-393-2200

1               **A P P E A R A N C E S**

2       **H. TOBY SCHISLER, Esquire**
        Dinsmore & Shohl, LLP
3       1900 Chemed Center
        225 East Fifth Street
4       Cincinnati, OH 45202
        (513) 977-8200
5                       Attorney for Plaintiffs,
                        Unifund Corporation and
6                       Unifund CCR Partners
                            Via Telephone

7

8

9               **I N D E X**

10                                          **Page**
        Direct Examination by Mr.Schisler      3
11      Stipulation                           63
        Certificate of Oath                   64
12      Certificate of Reporter               65
        Errata Sheet                          66
13

14

15

16

17

18

19

20

21

22

23

24

25

1    The deponent herein,

2                    **PETER SALOMON**

3        being first duly sworn to tell the truth, the

4        whole truth, and nothing but the truth, was

5        examined and testified as follows:

6                    **DIRECT EXAMINATION**

7    BY MR. SCHISLER:

8        Q     Good afternoon, Mr. Salomon.

9        A     Good afternoon.

10       Q     We are here today for your deposition, and

11   like the last time, we are proceeding

12   telephonically.  So if that makes it difficult for

13   you to hear me or anything along those lines, let

14   me know and I will make sure to speak up or restate

15   my question or anything along those lines.

16       A     Sure.

17       Q     Let me begin by asking you to state your

18   full name for the record.

19       A     Peter J. Salomon, S-a-l-o-m-o-n.

20       Q     Thank you.  And I know since we spoke last

21   time you're at least generally familiar with how

22   this process works, but let me just briefly

23   highlight some of the ground rules for you.  I'm

24   going to ask you a series of questions, and I need

25   you to answer them truthfully to the best of your

1    ability.  If you don't understand one of my

2    questions, please ask me to repeat it or restate

3    it, and I'll be more than happy to do so.  However,

4    if you answer the question that's posed to you, I'm

5    going to assume that you understood the question as

6    I presented it.  Okay?

7        A    Okay.

8        Q    If you will allow me to finish my

9    questions before you begin your answer, and I also

10   will allow you to finish your answer before I ask

11   my next question, that will make it much easier for

12   the court reporter to transcribe what we're saying.

13   That's particularly significant here since we're

14   doing this by phone.  If you feel that I've cut you

15   off in any way, let me know that, and I will

16   attempt to do the same thing.  And we'll try to

17   minimize the amount of time that we're speaking on

18   top of each other.

19        Similarly, if you can answer, you know,

20   all the questions verbally, I certainly obviously

21   can't see things like head nods or shrugs or

22   anything along those lines, and also avoid things,

23   you know, along the line of uh-huhs or huh-uhs or

24   those kinds of things because those just don't

25   transcribe well.

```
 1              And if you need to take a break, we can do

 2      that.   I don't expect this to be a lengthy

 3      deposition.   But if for some reason during the

 4      proceeding you need to take a quick break, we can.

 5      That's fine.   Just let me know, and we can take a

 6      couple of minutes off the record.   The only

 7      exception to that being is if I have a question

 8      pending, meaning there's a question that I've asked

 9      you that has not yet been answered, we'll have to

10      answer that question before we can take a quick

11      break.   All right?

12          A    Okay.

13          Q    All right.   Having laid those quick ground

14      rules, let's briefly go through a little bit of

15      background information, and then we can talk about

16      a couple of quick substantive issues and wrap this

17      up fairly quickly.

18              Where are you currently employed, sir?

19          A    Currently, I have several businesses.

20          Q    Okay.

21          A    But currently, I am taking a brief

22      vacation from everything, so I'm not working right

23      now at this moment.

24          Q    Okay.   Now, you said you have several

25      businesses or had?   I might not have heard that
```

1    correctly.

2        A    No, I have several businesses.

3        Q    Okay.  And what are those?

4        A    Well, objection, it's not -- it's

5    immaterial to the matters at hand, doesn't have

6    anything to do with -- with the complaint.  But I

7    do have several businesses, and as I stated, right

8    now I'm not working them.

9        Q    Okay.  And I appreciate that, but I do

10   have the right to gather some background

11   information and where you have worked and where you

12   currently work is appropriate.

13       So the businesses that you have, if you

14   can just describe those for me.  And your

15   objection's been noted.  But if you can tell me

16   what the businesses are, that will help us move

17   things --

18       A    They're related to mortgages and real

19   estate.

20       Q    Okay.  And what are the names of the

21   companies?

22       A    Star One Mortgage, Real Estate Tampa Bay.

23       Q    What is your affiliation with that

24   company?

25       A    I am president, officer of the companies.

1      Q      And what do you do with Star One Mortgage

2   Real Estate Tampa Bay?

3      A      Objection.  That question is immaterial to

4   this case -- to this matter, and I do not feel I

5   need to answer that.

6      Q      Okay.  And again, Mr. Salomon, I know we

7   talked about this some last week.  The standard

8   that governs discovery is that I'm allowed to ask

9   you anything that's reasonably calculated to lead

10  to discovery of admissible information.  There's a

11  very limited number of circumstances where a

12  deponent cannot answer a question, and you can make

13  all the -- you can make your objection and you can

14  preserve those objections for the record.  But only

15  if the question fails within a very, very narrow

16  set of circumstances can the deponent refuse to

17  answer.  Generally speaking, unless the question

18  asks you to divulge information that's protected by

19  an attorney/client privilege or some other type of

20  privilege, then I'm allowed to ask you the

21  question.  So I appreciate that you noted your

22  objection and that's the appropriate thing to do,

23  but I do need to ask you to answer the question.

24           Just for your reference again the question

25  is:  What is that you do with -- describe basically

1    what it is you do with Star One Mortgage Real

2    Estate of Tampa Bay.

3        A    Once again, I object to answering the

4    question.  I -- it is not related to this matter.

5    It's not related to this complaint.  It's

6    irrelevant, and for that reason, I believe I don't

7    need to answer that.

8        Q    Sir, again, with all due respect, and I

9    really don't want to go down this path again, the

10   question -- it doesn't matter whether in your

11   opinion it's related to this litigation or whether

12   or not you deem it to be relevant.  I'm permitted

13   to ask you the questions.  You can certainly

14   preserve your objections.  There's a mechanism to

15   do that by registering your objection, but you do

16   not have the option not to answer the question,

17   particularly background-type questions like this.

18   We have not reached the substance.

19          So I will, once again, make the request on

20   the record that you answer the question that's been

21   posed to you.

22       A    The best I will answer the question is

23   related to mortgages and real estate investments.

24       Q    All right.  And what specifically do you

25   do with regards to mortgages and real estate

1    investments?

2         A    I procure mortgages and real estate.

3         Q    Okay.  Procure them for what, individuals,

4    for companies, what types of customers?

5         A    That -- objection.  That's a rather broad

6    question.  If you can rephrase it or state it

7    another way, maybe I can understand it.

8         Q    Sure.  Who's the typical customer for whom

9    you procure mortgages?

10        A    Consumer.

11        Q    Okay.

12        A    The general consumer, individuals.

13        Q    Okay.  How long have you been the

14   president of that company, Star One Mortgage Real

15   Estate of Tampa Bay?

16        A    Oh, approximately nine years.

17        Q    And during the entire nine year tenure,

18   have you done basically the same thing, procure

19   mortgages for the consumers?

20        A    And real estate investments, yes.

21        Q    Okay.  All right.  Now, you indicated that

22   you have several businesses, you've told me about

23   Star One --

24        A    Those are it.

25        Q    Excuse me.

1     A     Those are it.

2     Q     Okay.  Star One Mortgage Real Estate of

3 Tampa Bay, that's all I have.  If there's several,

4 what are the others?

5     A     Those are the only businesses that I am

6 currently working or was working, but I am now

7 taking some time off for a few months.

8     Q     Okay.  Any reason in particular that

9 you're taking time off for a few months?

10    A     No.  I've been working for 30 years, and I

11 think I'm due some time off.

12    Q     I'd say that's probably true.  Okay.  Just

13 help me understand, because the word you used

14 yourself was several, and we only have one, so --

15    A     No.  You have two.  You have Star One

16 Mortgage and Real Estate Tampa Bay.

17    Q     Oh, I apologize.  I thought that was all

18 one.

19    A     No.

20    Q     Star One Mortgage is one entity and then

21 Real Estate Tampa Bay is --

22    A     That is correct.

23    Q     I apologize.  I misunderstood that.  Okay.

24 And just so I'm clear, you're the president of each

25 of those companies; is that correct?

1      A     I'm vice president of Star One Mortgage,

2  I'm the principal representative, I'm the -- and

3  I'm also the president of Real Estate Tampa Bay,

4  Inc.

5      Q     All right.  And do both of those entities

6  perform essentially the same function, they both do

7  similar type of work?

8      A     No, they do not.  One is real estate

9  investments, personal, and the other is procuring

10  mortgages for individuals.

11      Q     Okay.  And I'm just going to venture a

12  guess, based upon the names, that Star One Mortgage

13  in this instance is the one of those two that

14  procures mortgages?

15      A     Correct.

16      Q     Okay.  Have you been affiliated with both

17  of those companies for the past nine years?

18      A     No.  Real Estate Tampa Bay, I don't know

19  exactly how long, but at least two or three years.

20      Q     Okay.  Who else, if any -- excuse me.

21  Strike that.

22            What other entities, if any, other than

23  these two have you been employed by within the last

24  ten years?

25      A     Those are -- those have been my main

1    employment, my main source of income.

2         Q    Have there been any other sources of

3    income other than those two entities in the last

4    ten years?

5         A    That I recall, no.

6         Q    Okay.  Okay.  And what about before your

7    affiliation with those two entities, what did you

8    do prior to that?

9         A    I was always in the real estate and the

10   mortgage/credit business, mortgages.  I was always

11   into mortgages for the most part of my life and

12   real estate.

13        Q    Okay.  Where do you currently reside, sir?

14        A    I do not have -- I do not have an address

15   right now.  I've moved from the location, and I'm

16   currently staying wherever I travel with friends.

17        Q    Okay.

18        A    And I will not until probably about June

19   of this year establish another permanent residence.

20        Q    Okay.  Let's talk about the Unifund CCR

21   Partners, Inc. entities in which you're affiliated.

22   All right?

23        A    Would you -- is that the entity with the C

24   period, R period, R period?

25        Q    Right.  Yeah, I -- yeah, I know what

1    you're referring to.  Just so we're clear, I

2    understand you have objections to the fact that the

3    entity that's identified in the complaint is a

4    different and distinct entity than the one that

5    you're affiliated with.  So just so we're clear on

6    the record, I'm only going to be asking you

7    questions about the entity you're affiliated with.

8    So any question I ask you about your company, you

9    can presume I'm referring to the one in which you

10   have an affiliation.  Okay?

11       A    Yes.  I would like to preface -- you know,

12   before we begin, that all the answers with regards

13   to the attached Interrogatories and discovery, you

14   know, they're all prefaced with an objection,

15   immaterial.  The defendant as stated and described

16   within the plaintiff's complaint and the attached

17   Interrogatories and discovery request is not the

18   party answering said Interrogatories and written

19   discovery request.

20       Q    Sure.

21       A    However, I'll answer questions as to my

22   company, Unifund CCR Partners, Inc., no period in

23   front (sic) of the C, the C or the R.  And also for

24   the record, I just wanted to state that initially

25   when I answered the complaint, I was unaware, as

1    you were, as the judge was or has been, that it was

2    against the wrong defendant, and it was not until

3    about a couple of days prior to the first

4    deposition that I fully became aware that the

5    plaintiffs were suing the wrong party.

6        Q    Okay.  And I appreciate that, that you put

7    that on the record.  Just so we're clear and just

8    so I know, and make we make sure it's clear for the

9    record, you did file an answer to the amended

10   complaint directed to Unifund C.C.R. Partners, with

11   periods in the C, C and the R; correct?

12       A    That is correct.  But I was unaware at the

13   time that it was the wrong defendant.

14       Q    Sure.  I appreciate that.  And as we sit

15   here today, have you filed anything with the court

16   to amend that answer?

17       A    No.  Because it was -- the discovery of

18   that issue was rather recent, and it was -- as I

19   stated, it was at the last deposition that I

20   brought it up that it was about a couple of days

21   prior to that deposition that I had discovered

22   that, and, you know, we've been in a mad rush to

23   get this deposition done, so --

24       Q    Sure.

25       A    -- as of yet, no; but I would think,

```
 1    Counsellor, that maybe you can amend that.

 2       Q    Sure.  And I just wanted to clarify if you

 3    had anything floating around that I have not yet

 4    seen.  That's all.  Well, okay.  We'll just -- I

 5    appreciate the objection and the notice that you've

 6    put on the deposition as kind of a prefaceory

 7    (phonetic) statement, and I think we're both on the

 8    same understanding as to what your objections are

 9    in that regard and I think we're also both on the

10    same page that I'm only asking you questions about

11    the entities that you're affiliated with.  And I

12    certainly appreciate the distinction you've drawn

13    in terms of the spelling between those two names.

14    Okay?

15       A    Okay.

16       Q    All right.  Let's talk about the company

17    that you have an affiliation with.  Just so I don't

18    have to say the dot, dot, dot, I'm going to refer

19    to it as Unifund CCR Partners or your company or

20    something along those lines just because it's

21    easier to say.

22       A    That would be fine.

23       Q    Okay.  Let's talk about that particular

24    company.  I know we asked this in the last

25    deposition, but so it's all clear in the same
```

1    transcript, what positions, if any, do you hold

2    with that company?

3        A    I hold all positions as officer, as

4    president, vice president, secretary/treasurer,

5    director, registered agent.

6        Q    Okay.  When was that company formed?

7        A    I believe sometime July of 2006.

8        Q    Okay.  Was anyone other than yourself

9    involved in the formation of that company?

10       A    No.

11       Q    Okay.  Why did you form that company, sir?

12       A    I formed that company in order to separate

13   my other company's real estate investments, pool

14   them into another company because of the rentals

15   and the -- you know, for those reasons, just

16   separate -- separate the properties from one

17   company to another.

18       Q    Okay.  So what specifically was it that

19   you envisioned the Unifund company doing?

20       A    Personal real estate investments just, in

21   essence, having a corporation regarding my real

22   estate investments.  That's it.

23       Q    Okay.

24       A    Not soliciting the public, not doing

25   anything else.

1  Q    Okay.  How did you choose the name Unifund

2  CCR Partners, Inc.?

3  A    Well, Unifund was a name that I've had in

4  the back of my mind for a long time; and Partners I

5  thought was appropriate because the two companies

6  merging their real estate portfolio into this

7  corporation; and really the CCR, I mean, you might

8  think it's a joke, but that was my favorite group

9  in the '60s and early '70s; so that's where I got

10  the CCR, that's where I got the Partners and the

11  Unifund.  But Unifund was the name that I was

12  toying around with for a long time.

13  Q    You say the name you've been toying around

14  for a long time, can you give me an idea how long?

15  A    Oh, when I say a long time, I would say

16  maybe a month or two prior to that, to me forming

17  the corporation.

18  Q    What particularly about it was it that you

19  liked?  What was it that made you think of that

20  name or just the name that you felt would be

21  interesting?

22  A    Uni, one, fund, one fund.  The purpose of

23  the corporation was to put everything into one

24  fund.  I mean, that's basically what it was and --

25  Q    I'm sorry.  Go ahead.

1     A    And when I searched public records, I saw

2    various Unifunds and -- that were registered with

3    the Florida Secretary of State, and they were

4    registered for a long time; and I didn't see any

5    problem with using that name.

6    Q    Okay.  Let me ask you a couple of

7    questions.  You said that you wanted -- you liked

8    the name Unifund because everything was to be

9    merged into one fund.  What everything are you

10    talking about?  When you say everything was going

11    to be merged into one fund, what is the

12    "everything"?

13    A    Well, everything -- when I say

14    "everything," I'm talking about all the real estate

15    -- all the real estate acquisitions, all the real

16    estate properties that were acquired were going

17    into one corporation.

18    Q    Okay.  Was this corporation intended to

19    replace Star One Mortgage or Real Estate of Tampa

20    Bay?

21    A    No.

22    Q    Okay.  In other words, those entities were

23    going to continue to invest; is that correct?

24    A    Correct.

25    Q    And Unifund CCR Partners was intended to

1    work in conjunction with them?

2         A    No.  No.  Separate entity.

3         Q    Okay.

4         A    Well, a Florida for profit corporation.

5    Separate entity.

6         Q    Okay.  So what interrelation, if any, did

7    the Unifund entity intend to have with Star One

8    Mortgage and Real Estate of Tampa Bay companies?

9         A    Other than what I previously stated, none.

10         Q    Okay.  All right.  So is it your

11    testimony, sir, that the fact that you wound up

12    with a name identical to that of my client, it's

13    just a pure coincidence?

14         A    Yes, it is.  It actually is.  Because I --

15    for the most part, I mean, I just played around

16    with the names for a few months, and, you know, I

17    came up with that name.  And when I

18    cross-referenced those names with the Florida

19    Secretary of State, Division of Corporations, there

20    was no entity that was registered with that name,

21    and there were other existing entities using the

22    name Unifund; and for that reason, I didn't see any

23    problem with that.

24         Q    Okay.  And I'm going to ask you some

25    questions about that in a second.

1  A Sure.

2  Q Now, you indicate the CCR reference, you

3 said that that was because your favorite band was

4 Credence Clearwater Revival?

5  A Yeah.  It's silly, but it's true.  That's

6 what it is.

7  Q So why did you want to have a reference to

8 your favorite band included in the name of the

9 company that was going to be handling, you know,

10 basically real estate holdings?

11  A Phonetically it sounded nice, and it was

12 -- it just had a nice ring to it.

13  Q Okay.  Any reason other than that?

14  A No.

15  Q When did you come -- you mentioned that

16 the Unifund name had been kind of bounced around in

17 your head for a month of so and you liked it, when

18 did you come to the conclusion to sort of merge

19 that Unifund monitor with the CCR name?

20  A I did that as soon as I -- as soon as I

21 found out through the Florida Secretary of State,

22 Division of Corporations website that that name,

23 you know, was available.  That it wasn't -- and

24 that it was being used by other companies, so I saw

25 no harm in using that name.

1       Q    Let me try to understand that.  You

2   decided you wanted to use Unifund CCR Partners

3   after you saw that the name Unifund CCR Partners

4   was already being used by other companies?

5       A    No.

6       Q    Is that what you said?

7       A    No.

8       Q    The name Unifund, not the CCR -- the CCR

9   part was something that I -- you know, I really was

10  going to do it anyway.  I was going to probably

11  name it CCR Partners, Inc., but as -- but the

12  Unifund is such a common -- common name, a common

13  word, and it just -- it just implies exactly what I

14  was proposing to do, just one fund, one -- you

15  know, one company, you know, with all these real

16  estate acquisitions.  I don't know if I've made

17  myself clear with that, but you know, just using

18  that one company for the real estate acquisitions.

19      Q    As I understand your testimony correctly,

20  when you elected to register your company's name

21  with the Secretary of State, you were aware of the

22  existence of other entities using the name Unifund;

23  correct?

24      A    Yes.  Other entities that were not related

25  to your plaintiff, that had no direct or indirect

1    relationship to your plaintiff.

2        Q    Okay.  But you did -- but you did see the

3    existence of other entities that had the name

4    Unifund; correct?

5        A    There was one that was inactive which was

6    Unifund, and I am assuming that that is one of your

7    plaintiffs; but that that name was inactive.  That

8    corporation was inactive.  The others that I saw

9    had no affiliation or no direct ties or indirect

10   ties to your plaintiff.

11       Q    Okay.  That's not exactly what I'm asking

12   you.  I'm just asking --

13       A    I never saw Unifund CCR Partners, Inc.,

14   no.

15       Q    That's not my question.  My question is:

16   Before you registered your company's name with the

17   Florida Secretary of State, you did observe and you

18   were aware of the existence of other companies that

19   had the name Unifund; is that correct?

20       A    Yes.  That were unrelated to your

21   plaintiffs.

22       Q    Okay.

23       A    That had no affiliations with your

24   plaintiffs that were filings within the Division of

25   Corporations.  Companies that had been in existence

1    prior to my choosing my name.

2        Q    Okay.  Other than reviewing the Secretary

3    of State registry, what materials, if any, did you

4    also review before choosing that name?

5        A    I had also checked with the Florida

6    Department of Financial Services to see if there

7    were any licenses issued to this name that I was

8    choosing, and there were not.  And I had also

9    called the Florida Department of Revenue, which is

10   a -- the best source really, because if a company

11   by that name is doing business in Florida, they are

12   supposed to be registered with the Florida

13   Department of -- with the Florida Department of

14   Revenue.  So seeing that that was not the case, I

15   didn't see any problem registering the name and it

16   was available.

17       Q    Did you make any effort to determine

18   whether or not the word Unifund or any of the other

19   words in the name of your business were Trademark

20   protected?

21       A    Well, it was very safe in assuming that if

22   other companies were using that name and they were

23   not affiliated with each other, you know, just that

24   -- that in itself told me that that should not be a

25   problem, and once again, the fact that the -- you

1    know, that Unifund, and I don't remember exactly

2    how it was -- exactly the name of the company, but

3    I believe it was Unifund Corporation or something

4    of that nature, that was an inactive company.  So

5    no, I had no reason to believe any of that.

6        Q    Okay.  And you said you saw several

7    companies using the name that you testified were

8    unrelated with each other?

9        A    Correct.

10        Q    How do you know they were unrelated with

11    each other?

12        A    Because when you look at their -- when you

13    look within the records, you could -- that's

14    something that you can tell.  I mean, you can tell

15    by their registered agent, their addresses, the

16    principals.  I mean, all that is indicative of --

17    you have, all that will tell you, you know, whether

18    or not they're related.

19        Q    Okay.  Did you contact the United States

20    Patent and Trademark office to inquire whether or

21    not the word Unifund was Trademark protected?

22        A    No, I did not.  At that time I did not.

23        Q    Okay.  Did you conduct an online search to

24    determine whether or not the term Unifund was

25    Trademark protected?

1    A    No, I did not.  I did not feel that there

2  was a need for it, because once again, there were

3  several companies using that name Unifund that were

4  totally unrelated to each other.

5    Q    Okay.  At any time, not just when you

6  registered the company, but any time since then,

7  have you ever conducted an examination or

8  investigation with the United States Patent and

9  Trademark Office to determine whether or not the

10  word Unifund is Trademark protected?

11    A    Yes, I did.

12    Q    Okay.  Was that in receipt -- after

13  receiving what I'll refer to as the first cease and

14  assist letter from our office or was it before

15  that?

16    A    I don't recall exactly when it was, but I

17  -- it had to do with -- it had to do with probably

18  the complaint or the letter, one of the two.  I

19  have no idea.

20    Q    Okay.

21    A    I don't remember.

22    Q    I'm sorry?

23    A    I don't remember exactly.

24    Q    Okay.  Let me try to break it down a

25  little bit.  Do you recall whether the

1   investigation you did with the USPTO, that's the

2   United States Patent and Trademark Office, do you

3   know whether that occurred before or after you

4   registered your company with the Florida Secretary

5   of State?

6       A    Could you repeat that question again,

7   please?

8       Q    Sure.  Whenever you did the investigation

9   with the Trademark Office, and we'll talk about

10  specifically what kind of -- what this

11  investigation was in a second.  I just want to know

12  whether you recall whether that investigation took

13  place before or after you register your company

14  with the Florida Secretary of State?

15      A    It was after I registered the company, and

16  it was after some type of action or notification

17  from your office regarding this alleged Trademark

18  infringement.

19      Q    Okay.  Now, describe for me what it is

20  that you did in terms of investigating whether or

21  not it was a Trademarked item.

22      A    I went online with the Federal Trademark

23  people, and I discovered that there was a Trademark

24  Unifund -- period.  That was it, Unifund.

25      Q    Okay.  Do you know what website you went

1     to?

2     A    The Federal Trademark -- I don't recall

3     exactly the name of the website.

4     Q    Okay. But your research revealed that

5     there was in fact a Trademark -- that the word

6     Unifund was in fact an owned Trademark, a

7     registered Trademark; is that correct?

8     A    Well, you know, once again, I mean, this

9     is based on what I saw on paper, that I had no idea

10     specifically if it was your client or not, but I

11     did discover that, yes.

12     Q    Right. And I'm not asking you if you can

13     tell us if that was my client or not. I'm just

14     asking whether your investigation revealed that

15     there was in fact a Trademark of the word Unifund.

16     A    Yes.

17     Q    Okay. After discovering that the term

18     Unifund was Trademark protected, did you -- did you

19     cancel your registration with the Secretary of

20     State in Florida?

21     A    No, I did not.

22     Q    Why not?

23     A    Because soon afterwards as I received

24     letters from you, I had -- it wasn't very clear,

25     but I did some more research regarding Unifund and

1   I understood that they were -- that they're a

2   collection agency, and in essence, I felt that --

3   you know, that I didn't have to withdraw that name.

4       Q    And why not, sir?

5       A    Because Unifund is not licensed with the

6   Florida Department of Financial Services as a

7   consumer or a -- as a consumer collection agency.

8   They're not registered with the Florida Department

9   of Revenue as doing business in the State of

10  Florida, and for those reasons -- you know, for

11  those reasons, those alone, it was enough to tell

12  me that in fact that the company, as I allege, was

13  doing business here without the benefit of proper

14  registration with the Secretary of State and/or the

15  entities that they're supposed to be licensed with.

16  And as a result -- if I may continue?

17      Q    Uh-huh.

18      A    As a result, I allege that doing business

19  in that fashion within the state, whereas they

20  cannot maintain or file lawsuits because they're

21  not registered with the Secretary of State, that

22  they were -- and they've been doing this, as I

23  discovered this later on, for years, that that

24  Trademark would be invalid.  Because one of the

25  stipulations within the law that -- regarding the

1    Federal Trademarks is that if at any time that mark

2    is used to deceive the public, that Trademark is

3    invalid.  For that reason, I felt that I didn't

4    have to cancel my registration.

5        Q    So if I understand your testimony

6    correctly, it's your belief that my client has been

7    deceiving the public; is that right?

8        A    It seems to be that -- yes, it seems to be

9    that.

10       Q    Okay.  And why do you believe they're

11   deceiving the public?

12       A    Because, number one, they're not properly

13   registered to do business within the State of

14   Florida; number two, they're not registered or

15   licensed with the Florida Department of Financial

16   Services as a collection agency; and number three,

17   they're not filed -- they have not filed with the

18   Florida Department of Revenue as a business doing

19   -- as a business that is doing business in the

20   State of Florida --

21       Q    Okay.

22       A    -- as required by Florida law.

23       Q    Now, you said it was your understanding

24   that my client is a collection agency?

25       A    That is correct.

    Q    What is that understanding based off of,
sir?

    A    It's based on when I did my research with
the Federal Trademark Office, it states
specifically what that trademark is related to and
one of the things it's related to is credit and
collections.  I believe.  Not -- I don't know if it
said credit.  Collections at least.  They, in
essence, are a collection agency.

    Q    Okay.  Help me understand something.  I
want to make sure I understand your testimony
correctly.  My understanding is a few minutes ago
you said that you did your investigation with the
Trademark Office, but that you cannot tell whether
or not that Trademark was owned by my client or
not.  So what I need some clarification on is if
you're basing your assumption that my client is a
collection agency based upon what you discovered
from your Trademark search with the USPTO, how have
you made the connection that that is in fact my
client?

    A    Well, that is the only Trademark -- that
is the Unifund Trademark that is registered, and
number two, as time went by and I received more
correspondence from you, the complaint, I can

1    reasonably tie that into your client later on,

2    but --

3        Q    So it's your understanding that the

4    Trademark that you have observed to be registered

5    with the USPTO, that that trademark is owned by my

6    client; is that correct?

7        A    It seems to be. As I -- you know, as I --

8    as this progresses, it seems to be. I cannot tell

9    you definitively because you haven't -- your client

10    hasn't evidenced anything of that nature within its

11    complaint, as it hasn't evidenced what type of

12    business they are. It hasn't stated what type of

13    business they are, what the nature of their

14    business is. I -- you know, it's just like

15    fighting a ghost, so until that's established, I

16    can't tell you definitely; but it appears to be

17    your complaint based on everything that's been

18    happening.

19        Q    Okay. Do you have any reason to dispute

20    that that Trademark is owned by my client?

21        A    I am not absolutely certain whether it is

22    owned by your client.

23        Q    Sure. I understand that. Let me ask you

24    this.

25        A    I mean, it's pretty much hearsay on your

1    client's part right now because nothing has been

2    evidenced within the complaint or within any of the

3    documents that that in fact is your client'

4    Trademark.  The only thing that's stated is they

5    have a Trademark, but that's the only one that I

6    found that's Unifund.

7         Q    Let me ask you it this way.  Do you have

8    any evidence that demonstrates that that Trademark

9    is not owned by my client?

10        A    I don't have evidence of that nature, no.

11        Q    Okay.  Now, turning back to the question I

12   asked you a moment or so ago, I was asking you to

13   explain to me in your own words how you made the

14   connection that my client is a collection agency,

15   and you described some information you derived from

16   the Trademark website.  Any other information or

17   anything else that you looked at that led you to

18   the conclusion that my client is what you describe

19   as a collection agency?

20        A    When I started receiving pleadings that

21   were addressed to my company, to myself as

22   registered agent, I started the process of trying

23   to find out who they belonged to --

24        Q    Okay.

25        A    -- and I couldn't find anybody in Florida,

1    so I went on the Internet and I looked.

2         Q    Okay.  Anything else that you looked at

3    that led you to the conclusion that my client is a

4    collection agency?

5         A    Well, based on the pleadings that I

6    received that -- once again, there's no evidence to

7    say they belonged to your plaintiff.  It's just

8    hearsay.  Nothing has been evidenced that these

9    pleadings do belong to your client, but every

10   pleading that I received that was addressed to me

11   that was not mine, that I know was not mine, they

12   were relating to collections.  They were relating

13   to -- to collections and collections of judgments

14   and that type of thing.

15        Q    Okay.  Anything else that you saw that led

16   you to that conclusion?

17        A    When I went on the website, I believe

18   there was -- there was references to your plaintiff

19   being a collection agency.

20        Q    Which website, sir?

21        A    I do not recall exactly what website it

22   was, but if I do recall, it was a website where the

23   owner or the president of the company was actually

24   stating within a newspaper article what type of

25   business Unifund was, and one of the things that I

1   believe was mentioned was that they were a

2   collection agency.

3       Q    Okay.  Have you ever visited or looked at

4   a website operated by my client; in other words, my

5   client's website, have you visited that at any

6   point in time?

7       A    I might have, yes.  Because I was trying

8   to find out who these pleadings belonged to, yes.

9       Q    Okay.  I believe it's unifund.com, have

10  you been to that website?

11      A    I don't recall the name exactly of the

12  website.

13      Q    Okay.  Do you have an understanding as to

14  what specific type of collection work that Unifund

15  does?  From your understanding, do you have any

16  idea exactly what they do or how they do that or if

17  it's limited to any specific types of collections

18  or anything along those lines?

19      A    I believe that -- and I don't recall

20  exactly who it was, but on one of the pleadings, I

21  made a phone call trying to find out, you know, who

22  this pleading could belong to, and I got into a

23  conversation with an attorney.  And I don't recall

24  the time, the place and the person right now, but

25  they did indicate that they were -- that your

1   client was a collection agency or is a collection

2   agency.

3       Q    Do you have any knowledge whether Unifund

4   does anything like buy debt portfolios or buy

5   credit card portfolios or anything along those

6   lines?  Do you know one way or the other?

7       A    I don't understand the whole buying debt

8   portfolio.  I do understand that there are

9   companies out there that do that, that are under

10  scrutiny right now by the Florida Attorney General

11  because they try to bypass, circumvent getting a

12  license as a collection agency, and I believe what

13  they do is they use attorneys that they -- they say

14  that they assign debts to attorneys and the

15  attorneys are acting on their own behalf, but, you

16  know, I mean, that's just -- that's just stuff that

17  I've seen and heard, and I can't tell you exactly

18  at this moment where I've seen and heard it, but I

19  have.

20          And also -- and also I have gone to the

21  courthouse and I have seen -- when all this started

22  -- when I started getting the letters from your

23  office and this whole situation started, I went

24  down to the courthouse and what I saw was that all

25  these judgments were in the names of Unifund,

1     Unifund Partners, Unifund -- all different

2     variations of Unifund, and I did not see any of

3     those companies registered with the Florida

4     Secretary of State, Division of Corporation.

5          Q     Okay.

6          A     And they have judgments against Florida

7     consumers.  Evidently to me, I'm not an attorney,

8     and until, you know, the time comes, it seems to me

9     that somebody is acting as a collection agency.

10         Q     Okay.  Let me -- you know, I meant to ask

11    this earlier.  It goes to background information.

12    Let me backtrack here for a second.

13         A     Sure.

14         Q     Are you a lifelong Florida resident, sir?

15         A     Oh, maybe just about.  Almost 30 years

16    here.

17         Q     Okay.  And where in the State of Florida

18    have you resided?

19         A     Oh, I've resided all over the State of

20    Florida.  I have traveled quite a bit.  I couldn't

21    tell you exactly everywhere I've been.

22         Q     Okay.  Okay.

23         A     I'm a single person.  I have no

24    responsibilities towards any individual or anybody

25    I have to answer to.

1      Q    Okay.  Were you married at any point in

2  time, sir?

3      A    I object to that question.  That is

4  irrelevant.  It's immaterial to this matter.

5      Q    I understand, but --

6      A    Once again, I object to that question.  I

7  refuse to answer that question, and I know what

8  you'll probably say, but I do refuse to answer it.

9      Q    Okay.  So you're going to refuse to answer

10  that question?

11      A    That is correct.

12      Q    We'll keep moving forward.

13      A    Thank you.

14      Q    Did you ever live in Palm Harbor, Florida

15  at any point?

16      A    Probably did, yes.

17      Q    Okay.

18      A    Several times.

19      Q    Several times you've lived in Palm Harbor?

20      A    Correct.

21      Q    Are you related or have you been related

22  to anyone named Bertha Salomon at any point in

23  time?

24      A    I could be, but I object to that question.

25  It's irrelevant, immaterial.

1      Q    Okay.  Have you ever -- sir, prior to your

2  interaction and your dealings with Unifund in this

3  particular case, did you ever have any prior

4  dealings with Unifund Corporation?

5      A    No.

6      Q    Or Unifund C.C.R. Partners, Inc.?

7      A    No dealings.

8      Q    Not your company.  My client, Unifund

9  C.C.R. Partners, Inc., did you ever deal with them

10  at any time prior to this litigation?

11      A    I never had any dealings with them at all.

12  Never did any business with them.  Never got sued

13  by them.

14      Q    Okay.  Are you aware whether my client --

15  I'm just going to refer to my clients generally as

16  Unifund.  Are you aware whether my client ever

17  acquired any debt portfolios held by you?

18      A    Can you repeat that question, please?

19      Q    Sure.  Are you aware of whether any --

20  whether Unifund ever acquired any debt portfolios

21  involving -- in which you were a --

22      A    Never.

23      Q    -- consumer?

24      A    Never.

25      Q    Did you ever receive any collection

1    notices or collection calls from Unifund?

2        A    Never.  However, see, what you're stating

3    to me right now -- I mean, are you telling me that

4    they're a collection agency?  I mean, if they're

5    not a collection agency, they shouldn't be calling

6    me.

7        Q    But I'm just asking you if you've ever

8    received collection --

9        A    No.  And I guess I shouldn't if they're

10   not a collection agency.

11       Q    I'm not trying to -- I'm not trying to be

12   smart or anything like that.

13       A    No, that's okay.  You're doing very well.

14   Thank you.  I appreciate it.

15       Q    Yeah.  I'm just asking if you've ever

16   received any collection calls or collection notices

17   from Unifund?

18       A    Never in my life.

19       Q    Okay.  Sir, did you ever have either a

20   credit card or a line of credit or anything along

21   those lines with Montgomery Ward?

22       A    Objection.  That question is immaterial.

23   It's not relevant to this matter.

24       Q    I think it may be.  And again, that's not

25   a proper basis for an objection.

1      A      Well, it would -- it would not be -- first

2    of all, I do not recall anything of the sort, and

3    first of all -- and second of all, you know, once

4    again, I object to that question.  It has no

5    relevance to this.

6      Q      Okay.

7      A      I mean, I do not ever remember having a

8    Montgomery Ward card.  If I ever did, it must have

9    been 25 years ago or so.

10     Q      Okay.  Maybe in the '80s perhaps?

11     A      I have no idea.  I do not remember.

12     Q      Okay.  All right.

13     A      Was your client around collecting at that

14    time?

15     Q      I'm just asking --

16     A      Okay.

17     Q      -- if you recall having a Montgomery Ward

18    credit card at some point?

19     A      I do not recall, sir.

20     Q      Okay.

21     A      Have you been checking into my credit?

22     Q      I have not, sir.

23     A      Okay.

24     Q      I have not.

25     A      Thank you.

1      Q    Okay.  Let's go back to talking about the

2  Unifund CCR Partners, Inc. entity that you're

3  affiliated with.  Does this own any assets?

4      A    No, not at all.

5      Q    Okay.  Does that entity have any bank

6  accounts, sir?

7      A    Not now, no.

8      Q    Has it at any time had any bank accounts?

9      A    No.  Because when this action -- when all

10  this started, I figured I'm going to wait until --

11  until we get this concluded.

12      Q    Okay.  Has the entity that you're

13  affiliated with, that Unifund CCR Partners, Inc.,

14  has that -- has it conducted any business, has it

15  dealt with any customers?

16      A    Well, it would have prior to the start of,

17  you know, this matter, this complaint, but I've

18  chosen not to do anything until we get this

19  situation resolved.

20      Q    Okay.  So just so I'm clear on the record,

21  there's not been any customers --

22      A    No.

23      Q    -- that's interacted with that entity?

24      A    No.  And there wouldn't have been anyway

25  other than, you know, the real estate investments

1    that my other companies have.

2         Q    Okay.  Has that entity received any form

3    of compensation or any kind of money or anything

4    along of those lines?

5         A    No, and it will not until this matter is

6    concluded.

7         Q    Okay.  Have you disseminated or

8    distributed any kind of advertising or promotional

9    literature or anything along those lines involving

10   the name Unifund CCR Partners, Inc.?

11        A    No, I have not.

12        Q    Okay.  Do you have any letterhead that has

13   that name on it?

14        A    I did.  But I haven't used it.  I don't

15   have it anymore.  I'm not using it until this

16   matter is concluded, hopefully in my favor.

17        Q    Okay.  Do you have any business cards that

18   you have used that have that name on that?

19        A    Once again, this corporation was not set

20   up to do business with the general public, so.

21        Q    So there are no business cards --

22        A    No.

23        Q    -- with that on it?

24        A    No.  Didn't need it.

25        Q    Okay.  Mr. Salomon, let me kind of go to a

1    different area for a second.  Earlier at the outset

2    of this litigation you were receiving some items in

3    the mail that were not directed to your company and

4    they were forwarded on to me; is that correct?

5         A    That is not correct.

6         Q    Okay.  Explain to me then what the

7    mailings were that you were receiving.

8         A    The mailings -- the pleadings were

9    addressed to me as registered agent for my company,

10   Unifund CCR Partners, Inc., no periods.

11        Q    Right.  But the pleadings that you were

12   receiving and the documents that you were receiving

13   didn't involve anything associated with your

14   company; correct?

15        A    From what I saw, no.

16        Q    Okay.  And those materials were forwarded

17   on to me; is that right?

18        A    Because the judge asked that I do so.

19        Q    Right.  That's correct.  Now, when was the

20   last time you received anything in the mail that

21   was mailed to you under the name Unifund CCR

22   Partners, Inc. that didn't -- well, let me

23   backtrack.  I'm assuming there would be no reason

24   why at this point you would be receiving anything

25   in the mail involving your company, because it

1    hasn't actually undertaken any business operations;

2    is that right?

3         A    Well, the reason that I would probably

4    receive something would be because your client has

5    no registered agent listed as required, you know,

6    by Florida statutes, and what these individuals --

7    these attorneys do is they look maybe for your --

8    and I'm assuming it's your client possibly.  Once

9    again, a lot of names -- a lot of different uses of

10   that name Unifund -- Unifund C.C.R. Partners,

11   Unifund Group, all sorts of names is coming under

12   the Unifund umbrella; and what's happening is these

13   attorneys, they go to the Florida Secretary of

14   State website, Division of Corporations and the

15   only registered agent for Unifund CCR Partners,

16   Inc., my company, is me.

17        Q    Right.

18        A    And so they rightfully assume that -- you

19   know, that we are the intended party, so they send

20   it to us.  And actually, it's just a mess that your

21   client created, not --

22        Q    I understand that.

23        A    -- mine.

24        Q    I think my -- I don't think my question

25   was entirely clear.

```
 1        A     I'm sorry.  Go right ahead.

 2        Q     That's okay.  It's my fault.  I think I

 3   didn't ask a very clear question.  What I was

 4   asking is:  Is there any reason why your entity

 5   would be receiving items in the mail, and my

 6   assumption would be that it wouldn't be because

 7   it's not actually undertaking business operations

 8   right now; is that correct?

 9        A     Well, your assumption is wrong, because as

10   you -- as you've done with me obviously gone on the

11   Internet and try to discover information about me,

12   there are many companies out there that are looking

13   to do business with new up starting companies and

14   they're not aware whether or not we're fully

15   operational, and they will direct mail to us.  And

16   as I stated, as far as pleadings and court

17   documents, it's just a very reasonable assumption

18   that if they're looking for a plaintiff or a

19   defendant by the name of Unifund CCR Partners, and

20   I am the only registered agent in the State of

21   Florida for that entity, then they're going to

22   direct mail to me.  It's not their fault.  It's not

23   my fault.

24        Q     Sure.  When was the last time you received

25   mail as the statutory registered agent for Unifund
```

1    CCR Partners?

2        A    Other than miscellaneous things like -- as

3    I stated, companies looking to do business with a

4    new entity, that type of thing, I really -- I don't

5    think I've received in awhile, that I recall, no.

6    Because I have -- I have filed a report with the

7    police department -- with the Pasco County

8    Sheriff's Office, and I stated to them that it

9    seems like I'm getting these pleadings that do not

10   belong to me and to please redirect them back to

11   the sender.  And if they are mine, to make certain,

12   and if they are not mine, make sure they get them

13   to the right party.

14       Q    Okay.

15       A    And as a result of that, that's helped.

16   As a matter of fact -- and I know that one of the

17   basic rules of -- in my end regarding a deposition

18   is not to talk a lot, but I was down in the

19   courthouse and I happened to meet one of the

20   processors that was serving me with these

21   pleadings, and he did inform me that they were

22   being returned as I instructed and as the sheriff's

23   department -- as per the report with the sheriff's

24   department.  You know, they go back to the sender,

25   the sender makes absolutely sure whether they're

1    mine or they belong to somebody else.  If they

2    belong to somebody else, it's their problem.  They

3    can go look for them.  If they belong to me,

4    redirect them back to me.

5        Q    Okay.  Now, you said you haven't received

6    anything like that in awhile.  Can you be a little

7    more specific in terms of how long awhile is?

8        A    Months.  I don't -- of that nature, I

9    would say months.

10       Q    Okay.

11       A    That I recall.  Okay?

12       Q    Sure.  That's fine.  Now, you said you

13   took some steps with the Pasco County Sheriff.

14   Were there any other entities or individuals you

15   spoke to about not having these items delivered to

16   you?

17       A    As I said, the process server, the

18   sheriff's department.  Also on the Internet I

19   informed the attorney -- Florida Attorney General's

20   Office and also the Florida Department of Revenue.

21       Q    Okay.  And specifically what you informed

22   them was that you were receiving these items in the

23   mail that did not appear to be intended for your

24   company; is that correct, sir?

25       A    I was receiving items that were not

1   intended for my company and that this other party,

2   your client, claims that it belongs to them and

3   that they are registered legitimately to do

4   business within the State of Florida.

5       Q    Okay.  Did you present any documentary

6   materials to any of these entities, Pasco County

7   Sheriff, the Attorney General's Office, did you

8   submit any documents to them or did you just have a

9   conversation with these --

10      A    No, it was just all e-mail within their

11  website, and as a result -- you know, they're

12  government agencies.  These are people that can

13  find all this stuff on their own.

14      Q    Yeah.  Okay.

15      A    I mean, I don't have to give them much of

16  everything.  So it is possible the Department of

17  Revenue, I might have gotten a little bit more in

18  depth with them, but to what extent, I don't recall

19  right now.  It's been a few months.

20      Q    Okay.  Do you have copies of any of the

21  e-mails or other materials that you may have

22  submitted to these different entities?

23      A    None that I can find, because I did it all

24  via -- via e-mail, and I believe whatever documents

25  I might have sent them, I didn't retain copy of the

1    documents because I knew what the matter was. And

2    I might have -- I might have a response, let's say,

3    from the Florida Department for bringing it to

4    their -- the Florida Department of Revenue for

5    bringing it to their attention and that they're

6    going to investigate it. That's the extent of

7    that.

8        Q    Let me just make this request on the

9    record. If you can go back and look through any

10    documents you have associated with that, anything

11    that you submitted to or received back from the

12    Florida Department of Revenue or the Pasco County

13    Sheriff or any other entity, if you have any of

14    those -- you find in your possession, just make a

15    copy of those and send them on to me, please.

16        A    I don't have them in my possession. I --

17    you know, once again, because I am -- I'm caught up

18    in this situation, and I fully, you know,

19    understand and know, you know, what I was talking

20    about, that I didn't keep copies of everything

21    because it was just -- it would be just keeping too

22    much stuff.

23        Q    Sure. No, I understand. I'm just saying

24    if you do locate any of these materials, just --

25    I'll make a request on the record that you send

1    those to me.  That's all I'm asking.

2        A    If I do locate them, yes.

3        Q    Okay.  That's fine.  That's fair enough.

4        A    Or I can at least give you names of

5    individuals if I can find it.

6        Q    That's fine.  Yeah.  Whatever.  Anything

7    you locate, just fill out the supplement of your

8    discovery by providing that to me.  That's fine.

9        A    Okay.

10        Q    Now, you recall sending some of the

11    materials on to me several months ago; is that

12    correct?

13        A    What materials are you referring to?

14        Q    Let me be more clear.  That's a good

15    question.  Do you recall forwarding on to me copies

16    of some of the legal summonses and the complaints

17    and things of that nature that you would have

18    received that did not appear to be directed to your

19    company?

20        A    Correct.

21        Q    Okay.  Since you forwarded those materials

22    on to me, you know, a couple of months or so, in

23    the time after that, have you received any

24    additional materials in the mail directed to you --

25    I'm sorry.  Strike that.

1          Let me start again.  Since you sent that

2     stuff on to me, have you received anything in the

3     mail that did not appear to be directed to your

4     company?

5          A     They were directed to my company.  If

6     anything was sent to me, it was directed to me and

7     my company.

8          Q     Right.

9          A     And if -- if I recall -- you know, I mean,

10    I can't remember everything, but if I recall, the

11    last time I got served on one, I gave it back to

12    the deputy and the deputy gave me a hard time about

13    it; and I just wrote a big note on it that it did

14    not belong to me and to return it to the sender and

15    I left it at the sheriff's office.

16         Q     And that occurred after you had forwarded

17    some of those materials on to me?

18         A     That is correct.  I got really, really

19    tired of -- first of all, I wasn't paid for the

20    last ones that I sent.

21         Q     Okay.

22         A     And, you know, here's one more coming in.

23    I thought that the best remedy would be to make

24    certain that they get forwarded to the right people

25    and save yourself, your plaintiff and myself a lot

1    of problems.  But that was after the -- that was

2    after the initial complaint was dismissed that your

3    plaintiff had against me.

4        Q    Okay.

5        A    So it was after that, after the judge

6    asked me to forward them to you.

7        Q    You intend to keep utilizing the name

8    Unifund CCR Partners, Inc.?

9        A    Yes, I do.

10       Q    Okay.  And do you intend to continue to

11   use it for the same type of business model that you

12   originally described to me earlier?

13       A    That's really the only business model I

14   intend to use it for.

15       Q    Okay.  Are there any investors in that

16   company other than yourself?

17       A    No, there is not.

18       Q    And if I understand your testimony

19   correctly, you're basically just waiting to see how

20   this litigation resolves before you undertake any

21   business through that company; is that a fair

22   statement?

23       A    That is correct.  I already have the name

24   registered, and, you know, I just have to wait

25   until the time is appropriate for me to do it.  But

1    anyway, I'm just going to take off until June on

2    all this.

3         Q    Okay.  Okay.  And that's regardless of the

4    outcome?  Even if this litigation resolved prior to

5    June, you're just going to take a break from

6    everything until then; is that right?

7         A    I'm just going to take a break from

8    everything from now on.  Until June I should say.

9         Q    Well, that makes sense.  That's perfectly

10   fine.  Okay.

11        A    Absolutely.  When somebody especially is

12   trying to sue me and take what I worked hard for,

13   yeah, I don't think so.

14        Q    Let me look through my notes, sir.  We're

15   just about done.  It may take a second.  We can go

16   off the record if we need to and I'm just going to

17   look through these and we'll wrap this up in a

18   second or two.

19        A    And by the way, Counsellor, if I may say

20   something.

21        Q    Sure.

22        A    You know, once again, at no time has it

23   ever been disclosed as to what your plaintiff's

24   nature of business is.  Okay.  And for me to -- to

25   deliver documents, names of potential witnesses of

1    expert testimony, et cetera, it's rather ludicrous

2    because I don't know what I'm addressing.  And I

3    need -- you know, one thing that needs to be

4    clarified is who your client is, what they do for a

5    living, what the nature of their business is, and,

6    you know, we can go from there if you want to

7    pursue that avenue.

8         Q    And certainly, you know, there are

9    mechanisms and a time and place available to you to

10   do whatever you deem necessary --

11        A    Absolutely.

12        Q    -- to express those types of issues.

13        A    Absolutely.  And I don't think

14   Mr. Rosenthal is going to react very well to me

15   asking him anything about his ex-wife or his other

16   personal stuff, but, you know, what's good for the

17   goose I guess.  But I just wanted to clarify once

18   again that -- you know, I just want to conduct my

19   business the way I intentionally set it up to be,

20   and it has probably nothing to do with what your

21   client does.  I don't -- if it is credit and

22   collections, it has nothing to do with what your

23   client does.

24        Q    You said a minute ago, you were asking

25   some questions of a Mr. Rosenthal, is that what you

1    said?

2        A    Well, Mr. Rosenthal is the president,

3    isn't he.

4        Q    Of my client?

5        A    Right.

6        Q    I guess my question would be where you

7    obtained that information from.

8        A    Well, as I stated earlier within this

9    deposition, I went into a website and I saw an

10   article --

11       Q    Okay.

12       A    -- regarding Mr. Rosenthal and what he

13   expressed his future plans for the company was and

14   what they do, et cetera, and they had his picture

15   on it and the whole thing.

16       Q    Okay.  That makes sense.  All right.  Let

17   me take a quick look through here.  I think we're

18   just about done.

19       A    And by the way, I admire the man.  A very

20   smart man.

21       Q    Just a couple of last questions, sir.

22       A    Sure.

23       Q    Are you still actively doing any work?  I

24   understand you're taking a brief vacation.

25       A    No, I'm not.

1    Q    Okay.  But my question was going to be,

2    let's refer back to the Star One Mortgage and Real

3    Estate of Tampa Bay entities.  After June, will you

4    still be doing any work with those entities?

5    A    Probably so.

6    Q    Okay.

7    A    I haven't -- I would probably have to

8    because I do have -- I do have matters regarding

9    that company I cannot abandon, but -- yeah,

10   probably will do so.

11   Q    And the aspect of those businesses that

12   was intended to be handled or directed to the

13   Unifund company that you formed, how are you

14   handling that aspect of it right now with those two

15   companies?  Do you understand what I'm asking?

16   A    No.

17   Q    Okay.  I don't think I asked the question

18   very well.

19   A    That's okay.

20   Q    My understanding is that you set up these

21   two companies and then the Unifund company was

22   intended basically to kind of work in conjunction

23   with them to handle certain aspects of those two

24   companies' business?

25   A    Initially when I started those companies,

1    I had no thought of utilizing Unifund.  I mean, I

2    started those companies years ago, but I did -- I

3    did visualize that eventually I would have to do

4    something like that.

5        Q    Okay.

6        A    Okay.  So -- for taxes, you know, I mean,

7    and just to keep everything separate, so it would

8    just be a lot easier on my accounting and my

9    bookkeeping.

10       Q    Okay.

11       A    I'm pretty much a one-man show and have

12   been doing it for 30 years.

13       Q    Okay.  The Unifund CCR Partners entity,

14   the one you're affiliated with, has that entity

15   filed a tax return?

16       A    No.  Not required to.

17       Q    And why is it not required to?

18       A    Doesn't owe any money.  Doesn't -- it

19   hasn't operated and it hasn't -- hasn't made any

20   money and it hasn't spent any money, except my

21   initial, you know, personal outgo which was the

22   formation of the corporation and some miscellaneous

23   things.

24       Q    Okay.  You provided to me with your

25   discovery responses the Articles of Incorporation,

1    it looks like, and -- I guess that's it.  Does the

2    Unifund CCR partners, Inc. company, does it have

3    any other corporate documents that haven't been

4    produced to me?

5        A    No.

6        Q    Are there any corporate minutes that

7    exist?

8        A    No.

9        Q    Okay.  Are there any shareholder records

10   that exist?

11       A    Well, what -- yeah.  What I initially --

12   just -- you know, just on paper what I initially

13   issued myself, you know -- well, but you have that.

14       Q    Right.

15       A    Right.  That's it.

16       Q    Okay.

17       A    That's all I'm required to do.  And as far

18   as the minutes, that's like one -- a one-liner.

19       Q    Okay.  That makes sense.  Is there any

20   written business plan or business model that exists

21   for that entity?

22       A    As I stated before, no.

23       Q    Okay.  And that company as I understand it

24   has not yet actively done any marketing or actively

25   undertaken any work; is that correct?

1    A    It wasn't intended to go out and do any

2  marketing.

3    Q    Okay.

4    A    It was -- but nothing has been done with

5  it as of yet.

6    Q    Okay.

7    A    And probably not until June.

8    Q    Okay.  What harm, if any, sir, would

9  result to you or your company if it did business

10  under a different name, if it did business under a

11  name other than Unifund CCR Partners, Inc.?

12    A    Well, this is -- I am rightfully entitled

13  in my view based on my -- the research I've done,

14  I'm entitled to use that company, the name of that

15  company.  I like the name of that company, and, you

16  know, I just have a perfect right to register that

17  name; and for that reason, I don't want to change

18  it just because somebody wants to bully me out of

19  it.

20    Q    Right.  I understand that.  I guess my

21  question is -- I understand you want to use it, and

22  obviously the whole subject of this litigation is

23  whether you can continue to use it.  I get that.

24  My question to you is:  Is there any reason why you

25  could not change it to another name?

1       A    I -- other than personal reasons, no.  I

2  like the name.

3       Q    Okay.

4       A    I mean --

5       Q    Right.  I understand you have a personal

6  preference for that name.

7       A    Correct.

8       Q    Is there any harm that would result to

9  your company -- that you're aware of, is there any

10  harm that would result to your company if it

11  operates under a different name?

12       A    Rephrase that question.

13       Q    Sure.

14       A    Go ahead.

15       Q    Sure.  As we sit here today, are you aware

16  of any harm that you can describe for me that would

17  result to your company if it operated under a

18  different name?

19       A    I don't know.

20       Q    Okay.  That's fair enough.  That's a fair

21  answer to that question.

22       A    I don't know.

23       MR. SCHISLER:  Okay.  All right.  Sir, I

24    think that's all I have for you today.  I

25    appreciate your time and your patience and your

```
 1         ability to answers the question that have been

 2         posed to you.  We are -- this case is, as you

 3         know, in ongoing discovery, ongoing -- in the

 4         event that there would be new information that

 5         would come to light, that we are not presently

 6         aware of, I would reserve the right to ask you

 7         some additional questions limited to that new

 8         information.  We wouldn't go back over things

 9         we've already covered.  But I would reserve the

10         right, if the opportunity were to arise, that

11         we would ask you questions about those types of

12         things.

13              THE DEPONENT:  Just remember that last

14         thing.

15              I'm sorry.  There's a delay.

16              MR. SCHISLER:  Okay.

17              THE DEPONENT:  Just remember that last

18         statement that you won't go back and ask me

19         about these previous questions.

20              MR. SCHISLER:  Right.  Yeah.  What I was

21         -- all I was saying to you, sir, is I was just

22         reserving the right to ask you about new

23         information, if that becomes available.

24              THE DEPONENT:  Absolutely.

25              MR. SCHISLER:  I wouldn't go back and
```

1      rehash things that were already discussed.

2          THE DEPONENT:  Absolutely.

3          MR. SCHISLER:  That's all that I have for

4      you today, and we'll complete the deposition.

5          As I explained to you last week, and I'll

6      just remind you again, you have the option to

7      review the transcript for its accuracy and then

8      you can sign it or you can essentially presume

9      the court reporter took everything down

10     accurately and you can waive that right.  But

11     you need to let the court reporter know if

12     you're going to accept signature or waive

13     signature.

14         THE DEPONENT:  I'd like to review it.

15         MR. SCHISLER:  Okay.  That's fine.  Then

16     the court reporter will prepare the transcript,

17     and it will be delivered to you along with some

18     instructions in terms of what needs to be done.

19     And that is -- that's all that I have for you

20     today.

21         THE DEPONENT:  And I thank you.  And I

22     will -- I guess we're -- it will be my turn

23     with the Interrogatories pretty soon, so I

24     appreciate your time and thank you.

25         MR. SCHISLER:  Okay.

```
1              *      *      *      *      *      *

2    THEREUPON, THE TAKING OF THE DEPOSITION WAS

3    CONCLUDED AT 2:22 P.M.

4              *      *      *      *      *      *

5                       STIPULATION

6        It was thereupon stipulated and agreed by and

7    between counsel present for the respective parties

8    and the deponent that the reading and signing of

9    the deposition is not waived.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PASCO

    I, the undersigned authority, certify that **PETER SALOMON** personally appeared before me and was duly sworn.

    WITNESS my hand and official seal this 9th day of April, 2007.

_____

LISA ANN BROWN
Notary Public - State of Florida

Lisa Ann G. Brown
Commission #DD231773
Expires: Aug 26, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

1                    **CERTIFICATE OF REPORTER**

2       STATE OF FLORIDA

3       COUNTY OF PASCO

4

5               I, LISA ANN BROWN, Court Reporter and

6       Notary Public, State of Florida at Large, certify

7       that I was authorized to and did stenographically

8       report the foregoing proceedings; and that the

9       transcript is a true and accurate record of said

10      proceedings.

11

12              I further certify that I am not a

13      relative, employee, attorney or counsel of any of

14      the parties, nor am I a relative or employee of any

15      of the parties' attorney or counsel connected with

16      the action, nor am I financially interested in the

17      action.

18

19              Dated this 9th day of April, 2007.

20

21      ------------------------------

22      LISA ANN BROWN, COURT REPORTER

23

24

25

```
 1    STYLE: UNIFUND CORPORATION, ET AL. VS. UNIFUND
            C.C.R. PARTNERS, INC.
 2    DEPOSITION OF:  PETER SALOMON
      DATE:  MARCH 16, 2007
 3

 4               E R R A T A   S H E E T

 5         I have read the foregoing pages numbered 1

 6    through 66, inclusive, and herewith subscribe to

 7    same as the correct transcription of the answers

 8    made by me to the questions recorded therein,

 9    unless noted.

10

11    PAGE      LINE          CORRECTION

12

13

14

15

16

17

18

19

20

21

22

23                    ------------------------------
                      PETER SALOMON
24

25    DATED:  _____
```